PAMELA O'LEARY TOWER  #6152
1330 Pacific Tower
1001 Bishop Street
Honolulu, HI  96813
Telephone: (808) 526-9500
Facsimile: (808) 533-4588
Email: pamelatower@earthlink.net

Attorney for Defendant TILETILE

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 0 3 2006

at 6 o'clock and 04 min. P M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO.  05-00232 JMS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | DEFENDANT'S SENTENCING |
| vs. | ) | STATEMENT; CERTIFICATE OF |
| | ) | SERVICE |
| | ) | |
| DANIEL TILETILE, | ) | |
| | ) | Time: 1:30 p.m. |
| Defendant. | ) | Date:  February 21, 2006 |
| | ) | Judge: J. Michael Seabright |

## DEFENDANT'S SENTENCING STATEMENT

TO:    ED KUBO, UNITED STATES ATTORNEY, MICHAEL KAWAHARA,
ASSISTANT UNITED STATES ATTORNEY; AND TO NEIL
TSUKAYAMA, U.S. PROBATION OFFICER:

Defendant DANIEL TILETILE, by and through his attorney PAMELA O'LEARY TOWER and pursuant to 18 U.S.C. §3553, et seq., hereby submits his statement in support of sentencing.

I.    Facts.

On April 7, 2005, Mr. Tiletile was arrested in Honolulu, Hawaii, while attempting to obtain payment for approximately one-half pound of methamphetamine that he and his co-defendants had delivered to a confidential informant earlier that same day.  Mr. Tiletile immediately cooperated and gave a statement regarding his involvement that confirmed one made earlier by Jerome Yapching, a co-defendant PSR at ¶¶13, 14, 16 and 17.  On April 8, 2005, Mr. Tiletile made his first appearance and on April 13, 2005, he was released on bond pending resolution of this matter.  PSR at ¶¶1.  On June 9, 2005, Mr. Tiletile pled guilty to a single count Information charging him and his co-defendants with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 846.  PSR at ¶¶ 2, 3.  Mr. Tiletile is before this court for sentencing.

II.    The Sentence.

Sentencing Procedure

In determining the *minimally sufficient* sentence, 18 U.S.C.A. § 3553(a)

requires this court to consider  the following factors:

(1) the nature and circumstances of the offense and the history and

characteristics of the defendant;

(2) the need for the sentence imposed--

        (A) to reflect the seriousness of the offense, to promote respect for the
        law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant;  and

        (D) to provide the defendant with needed educational or vocational
        training, medical care, or other correctional treatment in the most
        effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities;  and

(7) the need to provide restitution to any victims of the offense.

The primary directive in § 3553(a) is for sentencing courts to "impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth in paragraph 2." Under 18 U.S.C. §3661, *no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence. (emphasis added). This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as not ordinarily relevant to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* U.S.S.G. §5H1. See also United States v. Nellum, 2005 WL 300073, 2005 (N.D. Ind.); United States v. Naylor, 2005 WL 525409 (W.D. Va.)(concluding that sentence below career offender guideline range was reasonable in part because of defendant's youth when he committed his predicate offenses – he was 17 – and noting that in Roper v. Simmons, 125 S. Ct. 1183, 1194-96 (2005), the Supreme Court found significant differences in moral responsibility for crime between adults and juveniles). In sum, in every case, a sentencing court must now consider all of the §3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than

necessary to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors set forth in §3553(a), these statutory sentencing factors should generally trump the guidelines. See <u>United States v. Denardi</u>, 892 F.2d 269, 276-77 (3d Cir. 1989.)

III.    <u>Application</u>

<u>Nature and Circumstances of the Offense</u>

This is a serious drug offense involving the distribution, over a period of three months of approximately six pounds of ice. Mr. Tiletile is one of three charged defendants. It is Mr. Tiletile's first criminal conviction. To his credit, Mr. Tiletile immediately cooperated with law enforcement and gave a complete statement. He was truthful and candid at a subsequent interview. He unreservedly agreed to all of the terms and conditions of the prosecutor in negotiating the plea in this case. He filed no pretrial motions nor did he ever intend to do so. He waived indictment and pled guilty to an Information pursuant to a written plea agreement and by so doing, gave up his right to appeal except under certain limited circumstances. Of the three defendants in his case, he pled first. His quick plea caused the others to plead.

History and Characteristics of Daniel Tiletile

The history and characteristics of Daniel Tiletile are best expressed by the words of those who know him and by his own words.[1]  Christina Tiletile, Daniel's older sister, provides some background on Daniel's early years against which to measure his life up to the point where he committed this crime.   She writes:

> Daniel has lived a hard life due to him losing our mother at the age of two and never having a good relationship with our father. While our father was enlisted in the U.S. military, we lived with our stepmother. Daniel was emotionally abused on a daily basis by our stepmother. When we finally moved in with our father, Daniel endured emotional and physical abuse. During high school, Daniel was faced with one of his biggest challenges in life. Due to no parental and guardian guidance, he dropped out of high school and began using drugs. My relationship with my brother began to fade because I did not live with him, did not have the same friends, and had very little communication with him. He decided to leave the family and lived amongst friends. Because of his drug use and lifestyle, Daniel chose to isolate himself from the family. Not knowing how to help Daniel with his problems, the family severed the relationship. I had to ask friends at school of his whereabouts and whether or not he was doing okay. I heard that he had hit rock bottom but soon after Daniel made the decision to stop using drugs. Daniel's girlfriend, Reyna Jew and her parents helped Daniel significantly in getting his life together. He graduated from high school with a High School Diploma. He then attended Skyline Community College to help him find out what his interests were. Daniel then decided to fulfill a longtime dream of becoming a chef. He entered California Culinary Academy in 2001 and graduated with a 3.47 G.P.A in October 2002.
>
> I am aware that Daniel has pleaded guilty to a federal drug charge and am not writing the letter as an excuse of why Daniel should not be punished. I believe that Daniel is a good person who made a bad decision. In

---

[1] These are excerpted from letters that have been submitted to the Court and to Mr. Kawahara.

determining sentencing, please take into consideration that although Daniel committed a crime, he has no prior criminal record, has a college education, family stability, an impeccable work record, and is striving to achieve objectives and goals that are valued in society.

Justin Jack, father to Daniel Tiletile's nephew, Tahjae, writes:

I am writing this letter in concern of Daniel Reye Tiletile. I've known Daniel for over 10 years. . . . I have been with his sister, Christina Ann Tiletile, for almost 10 years. Daniel had a fairly difficult up bringing. His mother passed away when he was a child. His father used to be in the military. Daniel was forced to move around from home to home as a child. I believe these situations he experienced gave him the qualities he possesses today.

I attended high school with Daniel. He attended school on the regular, regardless of his situation. Daniel stayed persistent in perusing his education. He always expressed his feelings about one day becoming a chef. Daniel followed his ambition and graduated from California Culinary Academy. Daniel worked everyday. I still remember how excited Daniel was when he got his first official job as a cook. Every holiday, Daniel cooked meals for friends and family. Daniel valued his family dearly. I consider him a real home body.

Rey Tiletile, Daniel's father writes:

. . . Daniel has had a tough childhood. He has gone through a lot of moving around. On the day my son was born I was the happiest man in the world. But, at the age of one and a half, Daniel's mother passed away. Needless to say, your honor, being a single parent was hard. It was hard for me to raise two small children. Christina, Daniel's older sister is not much older than Daniel. I went and joined the U.S. Army and gave custody of my children to my mother in law, who is now deceased. Three years later I remarried so I had someone to take care of my children. Daniel and Christina returned to live with us until high school. . . . Even though life at home was not always stable, Daniel was always a good student when he went to school. He was an honor student. Being his father, I was so happy when he graduated from kinder through the culinary academy. Since Daniel is a very dependable son, whenever I need to go somewhere with my wife, he takes care of his little

sister for us. She always looked up to him and still does. She talks about how Daniel was an honor student and now she is too. . . . Daniel has always been a caring son. He invites us over for Christmas and takes us out for special occasions like my birthday. He always remembers to call to see how I'm doing on a regular basis. He attends all the family functions and tries his best to stay close to all of his family; He has been good to his dad even with all the jokes he makes about my old age. He has a great sense of humor like me. . . . Despite everything Daniel has been through, he remains a good son and a good person. He is a caring brother and uncle. I hope you can see that through these letters and give him a second chance. We all need him present in our lives.

Reyna Jew, his fiancee, writes:

I am Daniel Tiletile's fiancee and best friend. I have known him for over eight years. We have been through a lot together and he has put me through a lot but I do not regret any of it. My time with Daniel has been filled with great memories and lessons. We grew up together and are still growing, especially our bellies. I am aware that Daniel is facing sentencing for a federal drug charge and no matter what I will always love and support him, since he has always loved and supported me. Even though he has committed a crime, I am not angry with him because I know the type of person Daniel is and he would not put our future in jeopardy unless his motives were sincere. I hope you are able to see that Daniel has a bright future and feels great remorse for what he has done through this letter. I feel I know Daniel the best and I hope I am able to give you some insight into the kind of person he is and maybe why he committed the crime he did since he is not the best in communicating his feelings. Daniel has made a tremendous mistake but I am now asking you to give him another chance, to give us our life back . . .

Daniel saw how great my parents were when I wouldn't give them a chance. He loves my family as his own. . . . He always tells me that we are the family he always dreamed of. In Daniel's heart my parent's and my feelings come first before his own. Since Daniel feels that we have done so much for him, he always tries not to ask for anything when he needs help. He tries to figure out things on his own, which is what lead to his downfall. We were always there to help him when he needed any kind of help, which is why he feels we have already done enough for him. He always hated taking money

8

from my parents because he knows that they also live on a budget since both my parents are retired. My mom works part time for extra income. . . ..

The reason our finances were tight when Daniel committed his crime all started in October 2005 [2004], a night that changed our lives forever. Daniel and two of his closest friends were involved in a head on car accident. Right after the accident he called me and I begged him to go to the hospital but at the time he did not have health insurance since his job doesn't offer benefits. He refused to go because of how high the bill was going to be. He brushed off his injuries and came home. He continued to go to work and worked through his pain but his back eventually bothered him so much that he could not continue working. I urged him to quit his job so that his back could heal. Since his occupation involves being on his feet for many hours at a time his back was not getting a chance to rest. He was seeing a chiropractor but that seemed to be only a short-term solution because his back only felt better for a few days after seeing the chiropractor. I knew that when he quit his job our finances would be tight but we could manage as long as my parents helped us out for a while until Daniel could return to work because even with both of us working full time our rent consumed most of our earnings. I kept assuring him that everything was going to be okay but he was worried nevertheless. We always made decisions together in the past but he decided to take matters into his own hands without telling any of us. He thought he was helping us out, but instead he ended up hurting us more, which is why he is extremely remorseful now. He is his own hardest critic and since coming back he has felt nothing but guilt. He realizes how he has hurt us all by the crime he has committed and he is trying his hardest to make up for it.

His good friend Ryan Yema describes Daniel as:

> . . . a truly good friend of mine, who deserves to enjoy life and fulfill dreams. He is the type of person who stands out from a crowd because of his humor and intelligence. His passion for cooking motivates me to become a better person in our craft. I would hate to see Daniel waste years of his life, when he could be making a change in the culinary world. It might sound a little corny but, I believe he has the drive to do it.

A good friend is someone that would be there during good and bad times, especially while you have those difficult obstacles. A friend doesn't make

money a huge issue whether it is for the check at a restaurant or a birthday gift. That is just some examples of a real friend but, you can't forget that common ground you share with that special person like the conversations and humor. Daniel falls under all those descriptions. I have known him for about four years but, it feels longer. After the car accident I could always count on him to be there if I needed anything. My friends Daniel, Allan, and I were in a head on collision and that was one of the most scariest and life threatening situations I have ever been in. Allan suffered a fractured skull and is now wearing a metal a metal plate on his head. I remember if Daniel wasn't working he would be in the hospital giving our friend moral support. I think we all should cherish those certain friends that will be around a long time, so I don't want to lose one.

I met Daniel at the culinary academy and he had this passion for cooking. He is constantly cooking in and out work. If it doesn't have to do with food he doesn't really talk about it. If you were to ask him to think up a menu, he could tell you one out the top of his head from appetizers to desserts. I can't really tell you, your honor, where Daniel will be in the near future but, he and I do have plans in opening a restaurant. I can't say it is surely going to happen but, I would hate to know that it will never happen.

I hoped I described Daniel Tiletile enough to show what kind of a person he is because I really believe that he doesn't belong behind a cell. I don't like having to put words in other peoples' mouths but, I promise he will not make this mistake again. Mistakes are part of being human, without them, we would never learn and grow up to be responsible and smarter person in our society.

His other close friend, Allan Chavez writes:

My name is Allan Chavez and I am aware that Daniel is pending a federal sentence. Despite his current situation Daniel is and will always be one of my closest friends and it does not change how I feel about him. I met Daniel through my close friend that I grew up with, Ryan. Since Ryan went to culinary school with Daniel. I have known Daniel for about five years now. Through all the years that I have known Daniel I had also had the chance to meet his girlfriend and most of his close family. When I first met him I knew that we were going to get along. We shared the same sense of humor and had much in common. We live very close to each other and hang out on

10

a regular basis outside of work. Through out the years Daniel has become one of my best friends. The three of us have become inseparable. From the beginning I knew I could count on him. He has always been a modest friend that not only cares about his family, but also the people around him. When I think of Daniel I think of him as being humble and good hearted. . . .

During the year of 2004 all three of us would go gambling after work, which was fun until the month of October. We were involved in a horrible accident. It was a head on collision where we were all injured. Ryan was driving and Daniel and I were passengers. I had been injured the most due to the fact that I had broken my nose and cracked my skull. Ryan and I were rushed to the emergency room while Daniel got a ride from the police since he did not have insurance. Daniel and Ryan both stayed with me until Ryan's dad had picked them up and I was later transferred to another hospital. I was in the hospital for over two weeks and they would visit me almost everyday to make sure I was okay. Daniel knowing that we have the same sense of humor would constantly make jokes to make me feel better about the situation. After I was able to return home after the surgery, Daniel would still come over and bring food for me since I wasn't able to leave the house. The time during my recovery showed me how good a friend Daniel has been to me. Daniel was so caring and supportive which I think are very important characteristics in a friend. Not many friends are really there for you when you need them.

I can tell that Daniel has learned a lot over these past months. His main focus has been at work, family and friends. He has been working a lot more now and also volunteers at a non-profit organization. I know because we have had less time to just hang out. His main concern now is trying to make up for his mistakes by focusing on what he can change in the future. He talks to me about wanting to open up his own restaurant one day. As a close friend to Daniel I can see the anguish he has been through, through this whole ordeal. He is sincerely sorry for what he has done and constantly expresses his regrets. I can sincerely say since I talk to Daniel everyday that Daniel is genuinely a good person who cares so much about his friends and family. Since I have met him Daniel he has been nothing but a great friend. He has a bright future with his fiancee, Reyna and I hope you can help him towards that future.

11

His future in-laws, Mr. and Mrs. Jew write:

> We have gotten to know Daniel Rey Tiletile very well since he has been dating our daughter Reyna for the past 8 years. In the beginning we were very concerned about our daughter dating and getting so serious at such a young age. They met when they were only fifteen years old. Our doubts soon faded away as we have gotten to know Daniel. We even invited him to live in our house when he needed a place to stay. We have been a very tight knit family since. Even after they moved out into their own apartment we have remained very close which is why when we heard that he had gotten into trouble we did not hesitate to offer as much help as we could. We did not waste anytime using our property and agreeing to supervise him to get him home as soon as possible. Reyna and Daniel even moved back in with us. We know the details of his case and despite that we do not think any differently of him. If we did not think he was of great character we would not have allowed our daughter to date him for the past eight years. Since coining home we have witnessed how sony he is of his crime and how committed he is to trying to make up for his mistakes by helping out the community, attending church on a regular basis and working harder than ever at his career. We know first hand how bright of a future Daniel could have in both his career and with our daughter so we are desperately asking that you can do what is in your power to not derail them from their path.

David Weiss, owner of Catch Restuarant, in San Francisco, California, writes:

> I write this letter as an update and information that I believe should be considered prior to sentencing of Daniel Tiletile.

> Daniel has continued to work at Catch Restaurant during the past six months as a line cook and shift manager. He has performed as a star employee. He has always arrived for work on time or early for his scheduled shifts. He has never complained or acted in any way other than a professional.

> Because of Daniel's commitment and work ethic, he was in place to become sous chef/assistant kitchen manager and eventually work into the position of chef. His passion for food, cooking and customer satisfaction shows in every dish he creates.

I understand that Daniel must pay his debt to society. As owner of Catch Restaurant, I would look forward to having Daniel work for us in the future after he has served his sentence.

Amy Dittmar, former Executive Chef at Catch Restaurant writes:

I have known Daniel Tiletile for about three and a half years. During this time, I had been the Executive Chef at Catch Restaurant in San Francisco. Daniel came to work for me right out of culinary school. He had worked in one previous restaurant as his externship. When he began working for me, he started in the salad station and worked his way up through the kitchen. He has always worked very hard. He is very loyal, honest and giving. Our restaurant was very active with various charities in San Francisco, and Daniel was always the first to volunteer his time to help. Every event that we participated in, Daniel was there. As time progressed and he began to learn all the stations in the kitchen, we decided to train him as a fill in for the management staff. When I went on my honeymoon earlier this year, Daniel stepped up and replaced me when I was gone. The owner and myself were very impressed by his work ethic. I left Catch Restaurant at the end of November. When I gave my notice, the first person the owner and I wanted to be promoted to Executive Chef was Daniel. We were aware of his recent problems with the law and decided that since his future is unknown that we would not promote him. He is still working at Catch and continues to assist the management team.

Over the years, I have also gotten to know Daniel on a personal level. I can honestly say that he is the most caring and dependable person that I know. He is the type of person that always thinks about the needs of others before his own. He is always honest, no matter what, and he will always be there for you. He is very loyal his friends.

I know that Daniel has made a huge mistake and trust me, he recognizes that he was very wrong for what he did. Not only from the stand point that this will effect him and his family for the rest of his life, but he also sees why this was wrong. He knows that there will be punishment for his crimes, but will effect him and his family for the rest of his life, but he also sees why this was wrong. He knows that there will be punishment for his crimes, but everyone including myself and his family and friends, hope that he will not be given the maximum sentence. This is one person who can make a

13

difference in society by talking to schools because he honestly understands what he did was wrong and why. Daniel has so much to offer. It has been his dream to open a sandwich shop, and I believe he will one day. He is very determined and has the talent to do whatever he sets his mind to.

I am sure you hear this all the time, but Daniel is very special and while I understand he has to pay his debt to society I strongly believe it would do him more harm than rehabilitation to remain incarcerated for longer than the minimum sentence.

Finally, Daniel Tiletile writes:

My name is Daniel Tiletile and I would like to start out first by saying how deeply sorry I am to the state of Hawaii for the crime that I have committed. My actions were inexcusable and I had to find out the hard way. I understand and accept that I will be facing federal time for committing a crime. I would be dishonest if I did not confess that my hope is to return to my life and career in a timely manner. While out on bail, I haven't been able to think about anything else except how sorry I am. I have been consumed by guilt. I have not only committed a crime against the state of Hawaii, but I have deeply hurt my family and friends who depend on me. Along with that I can't help saying that I have been concerned about my sentence because of how it will affect my loved ones, especially my fiancee. We were both just starting our careers and building our future together, but now that is delayed. Her parents felt like they could let go of their daughter since we were going to get married soon and start our own lives. I have also let down my friend Ryan since we were supposed to open up a restaurant together. I am also letting down my younger sister who is in the sixth grade and my nephew who is in kindergarten, since I helped raise them.

\* \* \*

My wrongful action does not exemplify who I really am. I see myself as being very hard working so when I was not able to work because of my back pains from the car accident I did not know what to do with myself. I panicked and instead of thinking of rational solutions I committed a crime. I was blinded by an easy solution. Now I have realized that there are no such things. Before the accident I was extremely focused on my career. So was Reyna who graduated from UC Berkeley and was hired for her current

position six months before she even graduated so that she could start working right after graduation. Since we were both working we got our own apartment in San Mateo which was half way between her work and the restaurant. My goal after graduating from the California Culinary Academy was to learn as much as a could so that I could open up my own restaurant. I even automatically started working one week after getting out on bail in May 2005 where I was last employed. I work at Catch Restaurant in San Francisco and have worked there for almost three years now besides my leave of absence due to my car accident and my most recent legal event. I started out here right after graduation and just like everyone else I had to work my way up from the bottom. I have worked very hard in my career to move up and have succeeded by being able to do as much as my Sous chef and chef. I know that I have accomplished a lot in my career because recently my Chef had resigned, and the restaurant owner knew that he could count on me to fill in. I worked my regular schedule and had also stayed later then I was supposed to on my time just to make sure everything ran smoothly. As far as what I do at work I pretty much work all stations, which are grill, fryer, saute, and pantry. Outside of cooking, I help out with the food orders and managing. I was next in line for the Sous Chef position since my Sous Chef is now the Chef . This position is hard to obtain in my field of work due to everyone in line. I regrettably had to turn it down because of my situation.

* * *

Outside of work I have been volunteering at a non-profit organization called Project Open Hand, which supplies people with diseases and eating disorders. I first learned of Project Open Hand when I was attending the CCA. We had a class where we volunteered for POH and I remembered thatI really enjoyed it and I was really impressed with the organization and how many people they help. I volunteer every Monday and Tuesday evening prepping and packing meals. I enjoy volunteering since not only am I able tohelp people, I am still in my field and I am able to practice my skills. I also really enjoy working with the other volunteers. I never knew how many people volunteered on their own time to help out and socialize. I have met many new people and enjoy working with them. I plan on continuing volunteer work when I am able to. Recently I was able to participate in a program to help middle school students through my cousin. My cousin is a case manager/counselor for troubled youths and he wanted me to share my

story and the lessons I have learned to the kids in his program. I wanted
them to know that all actions have consequences. I wanted to share with
them my story so that hopefully they will think twice before committing a
crime since I did not myself. I hope that they were able to learn from my
situation. I want people to think of me as an example of what not to do so
that at least somebody will benefit from my wrong doings.

I have learned a lot over this period of time and I am very sorry for the act
that I have committed. I have realized that my actions have affected
everyone in my life. I have hurt them all and I hope that I will be able to
make up for it soon. I have a lot of positive influences in my life and I
promise to go to them for advice and guidance in the future. I plan on
making up for mistakes by working hard and being the ultimate family man.
I want to thank you, your honor for taking the time to read what I have to
share.

These letters reflect a young man who suffered a chaotic and difficult

childhood and adolescence. Despite this chaos, or in spite of it, Daniel Tiletile,

through sheer determination and with the unconditional support of his sister

Christina, his fiancee Reyna and her parents, finished high school, attended and

graduated from the California Culinary Academy, obtained full-time employment

at Catch, one of the finest restaurants in the City and, while giving his all to Catch,

dreamed every budding chef's dream – to open his own restaurant with his friend

Ryan Yema, also a chef and graduate of the same culinary institute. This dream

evaporated in the split second of a tragic automobile accident that nearly took

Allan Chavez's life, and seriously injured Ryan Yema and Daniel Tiletile. When

Daniel Tiletile could no longer work at Catch because of back pain as a result of

his injuries, he found himself in economic difficulties. His dream of opening a

restaurant was quickly dissolving in the harsh light of his new economic reality. This, coupled with his youthful pride and his desire to be totally self-sufficient, prevented him from asking family and friends for help and he instead chose the quick solution of interim drug dealing. When viewed in the context of all that he had accomplished up to that point in his young life, this decision to sell drugs can only be described as the thoughtless, ill-considered, rash, action of a young man under extreme economic pressure who was not thinking clearly.

Daniel Tiletile is not a drug dealer. He is foolish, misguided and extremely repentant. Prior to the automobile accident, he was gainfully employed at work that he loved and he was engaged to marry Reyna Jew, a wonderful young woman he has dated for eight years. [2]

In <u>United States v. Patillo</u>, 817 F. Supp 839 (C.D. Calif. 1992), a district court departed downward based on aberrant conduct. The court there reasoned:

> . . . defendant's crime is an act of aberrant behavior. Defendant is surrounded by family and friends, who say that this is the first time defendant has been in any kind of trouble. The Probation Officer has described defendant's crime as "out of character." Defendant held a well-paid job, had a stable employment history, and only in a particular moment of financial weakness, committed this crime.

-------------------

[2] It has been recognized that recidivism is markedly lower for those defendants who were employed in the year prior to the offense and who are married. <u>See</u> U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines; <u>United States v. Nellum</u>, 2005 WL 300073 (N.D. Ind., 2005)(quoting the U.S.S.C. recidivism study).

Defendant had both unusual temptation and unusual opportunity to commit this crime--a crime for which he has demonstrated tremendous remorse. This court has confidence that if this defendant were not incarcerated, he would have learned enough from this criminal process not to make the same mistake again, and thus departs downward to the mandatory minimum.

817 F. Supp at 845. [3]

In <u>United States v. Moreland</u>, the district court explained its sentence as follows:

Clearly, Brian Moreland has not engaged in a "career" of crime and has not subsisted on a criminal livelihood. He is a 31 year-old man who has made both good and bad decisions in his life. He has not, however, demonstrated the pattern of recidivism or violence that would justify disposal to prison for a period of 30 years to life. One of the goals of sentencing remains the rehabilitation of convicts.

366 F. Supp 2d at 422.

The conduct here, while serious, was of limited duration – from January to March, 2005. Most importantly, as reflected in the letters from his family and friends, this conduct was motivated by unforeseen economic pressure coupled with youthful pride and a misguided desire to not ask for financial help. When

---

[3] Mr. Tiletile is aware that under the formerly mandatory guidelines, an aberrant conduct departure under the circumstances of this case would be prohibited by U.S.S.G. §5K2.20(c)(4). However, in light of <u>Booker,</u> the court is free to find his conduct to be aberrant despite the prohibition found in U.S.S.G. §5K2.20(c)(4) for two reasons: 1.) the guidelines are now advisory and 2.) the aberrancy of the conduct here is inextricably intertwined with the history and characteristics of Mr. Tiletile – for whom this ill-conceived venture proved <u>"a marked deviation from an otherwise law abiding life,</u>" a factor which now must be considered in determining the sentence. <u>See</u> 18 U.S.C. §3553(a)(1).

18

viewed in the context of his otherwise fairly remarkable young life and what he

had been able to achieve, this foray into criminality was clearly "a marked

deviation from an otherwise law-abiding life." United States v. Hued, 338 F.

Supp.2d 453,459 (S.D.N.Y. 2004).

The Purpose of Sentencing and Need to Protect the Public

Daniel Tiletile has no prior record, is unlikely to re-offend and is not a

danger to the public. He has accepted responsibility and he is genuinely

remorseful and cognizant of the effects of his actions. In sum, the record before

this court contains much salutary evidence about his character and confirms that

he is redeemable. A lengthy term of incarceration will not serve the purposes of

sentencing but rather would take away hope.   However, this is a serious drug

offense and it is, therefore, a factor that arguably supports a substantial prison

sentence in order to promote respect for the law, provide just punishment and

afford adequate deterrence to criminal conduct. A prison sentence should be

imposed. However, the length of the sentence should be tempered by the fact that,

when viewed in light of his undisputed exemplary personal, educational and

employment history, this crime is so far out of character for Mr. Tiletile as to be

deemed aberrant. As the Moreland court noted:

> . . . the goal of rehabilitation "cannot be served if a defendant can
> look forward to nothing beyond imprisonment.... A judge should be

hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life.   Punishment should not be more severe than necessary to satisfy the goals of punishment."

366 F. Supp 2d. at 422 (internal citations omitted)

Other Mitigating Factors

Early Disposition Departures/Disparity

Although U.S.S.G. §5K3.1 provides for a four level departure on motion of the government for early disposition program(s) as contemplated by the Patriot Act, the District of Hawaii has no such a program. [4]  However, it is noteworthy that prior to the implementation of § 5K3.1, the Southern District of California had been offering early disposition departures for border drug offenses pursuant to U.S.S.G. § 5K2.0 as a circumstance outside the heartland of the guidelines. [5]

---

[4] Mr. Tiletile is aware that the Ninth Circuit has rejected the disparity inherant in differing  plea-bargaining policies of U.S. Attorneys as a valid basis for departure. United States  v. Banuelos-Rodriguez, 215 F.3d 969 (9th Cir. 2000) (en banc).  However, the continuing vitality of the Ninth Circuit's position on this issue has been called into serious question by Booker and cannot be rejected out of hand.  See e.g. United States v. Galvez-Barrios, 355 F. Supp. 2d 958 (E.D. Wis. 2005) (Adelman, J.) (post Booker, in illegal reentry case where Guideline range was 41-51 months, court imposes 24 months in part because of unwarranted disparity in sentences among § 1326 defendants in border areas due to charging policies).

[5] See Testimony of Chief Judge Marilyn L. Huff, Southern District of California before the United States Sentencing Commission on Implementing the Requirements of the PROTECT Act – September 23, 2003 available at the United States Sentencing Guidelines website at http://www.ussc.gov/HEARINGS.HTM

Therefore, there is nothing to prevent this court <u>sua</u> <u>sponte</u> from reducing Mr.

Tiletile's advisory guideline range by four or more levels to bring him into parity

with other drug offenders who have received the benefit of an early disposition

departure pursuant to §5K2.0 solely because of the fortuity of being charged in a

district that had such a policy. Indeed, this is the position taken by the district

court in <u>United States v. Medrano-Duran</u>, 386 F. Supp 2d. 943, (N.D. Illinois

2005). In a well-reasoned sentencing opinion, the district court there fully

discussed the issue of fast track disparity. The court first acknowledged the

purpose of fast track programs:

> Fast track programs for illegal re-entry cases have existed for a
> number of years in some districts, primarily districts on the Mexican
> border with a large number of illegal re-entry cases. Generally
> speaking, prosecutors in those districts have agreed to significantly
> reduced sentences in exchange for prompt guilty pleas. The purpose
> of these programs was and is to facilitate prompt and easy disposition
> of cases to reduce the burdens they impose in those districts--there
> was not enough physical space to house detained defendants, and
> there were not enough prosecutors to handle all the cases brought to
> them.

386 F. Supp 2d. at 944. After hearing from the government about those districts

that had implemented such programs and learning that some of these districts were

not 'overburdened', the court then observed:

> If fast track programs were limited to districts that are swamped by
> illegal re-entry cases, a decent argument perhaps could be made that
> Medrano-Duran is not similarly situated to persons charged in those
> districts. But even though this may once have been the case, it is no

longer.  Based on the government's submission in this case, the
Attorney General has approved early disposition programs in the
Districts of Oregon, Idaho, Nebraska, and North Dakota, in which
each Assistant United States Attorney, on average, handles only two
or three illegal re-entry cases per year.  And an early disposition
program was also approved in the Western District of Washington,
which has less than one illegal re-entry case per prosecutor per
year--0.58 cases per prosecutor, to be exact, for the fiscal year 2003. .
. . It would be difficult to describe the illegal re-entry caseload in
those districts as unduly burdensome, let alone overwhelming.

386 F. Supp 2d. at 948. The court rested its decision to depart two levels on the

fact that:

> There is nothing in § 3553, Booker, or any other existing authority to
> support a construction of § 3553(a)(6) that allows Congress and
> prosecutors to determine what sentence disparities are warranted and
> unwarranted but prevents a court from doing so.   As other judges
> have stated, "[i]t is difficult to imagine a disparity less warranted than
> one that depends on the judicial district where the defendant happens
> to be found."

386 F. Supp 2d. at 948.   Early disposition programs are not limited to illegal re-

entry or border drug cases.  The intent of early disposition programs is to relieve

overly burdened districts by addressing whatever is burdensome to that district.  It

can be credibly stated that the number of ice cases in this district is close to if not

already "overwhelming."

Assistance to the Judiciary

Assistance to the judiciary and facilitation of the administration of justice

had been recognized as a mitigating factor in sentencing.  United States v. Garcia,

926 F. 2d 125 (2d Cir. 1991)(court can depart downward where defendant's plea induced others to plead thereby conserving judicial resources.); see also: United States v. Shaw, 263 F. Supp. 2d 10 (D.D.C. 2003)(recognizing that a defendant's guilty plea that causes others to plead could serve as a ground for departure)

Mr. Tiletile filed no pre-trial motions; he waived indictment; he pled to an information; he did not challenge any of the factual findings regarding relevant conduct; he waived his appeal rights except in very limited circumstances and, because he pled first, he caused his co-defendants to follow suit, thereby assisting this district in alleviating some of the burden of the high number of ice cases.

V.    The Need For The Sentence Imposed

"The need for the sentence imposed is determined by the seriousness of the offense, promotion of respect for the law, the need for a just punishment, general and individual deterrence, and the needs of the defendant. 18 U.S.C. §3553(a)(2)." United States v. Myers, 353 F. Supp 2d 1026, 1031 (S.D. IA 2005). Daniel Tiletile violated the law because he felt extreme economic pressure and was ashamed to ask for help. However, it is still a violation of federal law and "as a matter of general deterrence, the conduct involved should be punished in some fashion." Myers, 353 F. Supp. 2d at 1031.

Shortly prior to the commission of this crime, Mr. Tiletile was a young,

23

dedicated, highly motivated and professionally trained chef with a good work ethic
and the character and integrity of one who, when change is necessary, makes the
change without hesitation.  Prior to this incident, Mr. Tiletile had no criminal
history and he is now a convicted felon.  The collateral consequences of a federal
drug felony conviction are no "small irritation" to a person of good character and
work ethic who has never violated the law until now.  Myers, supra.  The conduct
here clearly was a departure from an otherwise law-abiding and productive young
life.  There is evidence of economic duress.  There is a history of stable
employment with the promise of employment post-incarceration.  There is a stable
long-term relationship with his fiancee, Reyna Jew, and there is the significant
unconditional support of his family and friends.

VI.    Conclusion

        In light of all of the Section 3553(a) factors and given all of the
circumstances of this case, a sentence of sixty months would be sufficient to
reflect the seriousness of the offense, promote respect for the law, and provide just
punishment for the offense.  A sentence of sixty months would take into account
Mr. Tiletile's immediate cooperation and quick plea caused his co-defendants to
plead and thereby saved this court and the government  valuable resources.  A
sentence of sixty months would not create an unwarranted disparity because it is

supported by the particular facts of this case, unique to Mr. Tiletile.  Finally, in light of the totality of the circumstances as set forth above, a sentence of sixty months clearly would be reasonable.

DATED:  Honolulu, Hawaii, February 3, 2006

PAMELA O'LEARY TOWER
Attorney for Daniel Tiletile

CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of Defendant's Sentencing

Statement was duly served on the following parties by U.S. Mail, Facsimile or

hand-delivery  on February 3, 2006.

|  | U.S. Mail | Fax | Hand-Delivery |
|---|---|---|---|
| MICHAEL KAWAHARA<br>Assistant United States Attorney<br>PJKK Federal Building, Room 6100<br>300 Ala Moana Boulevard<br>Honolulu, Hawaii 96813<br>Attorney for the United States | X | | X |
| NEIL TSUKAYAMA<br>U.S. Probation Officer<br>PJKK Federal Building,  Room C-110<br>300 Ala Moana Blvd.<br>Honolulu, Hawaii 96850 | X | | X |

DATED:     Honolulu, Hawaii, February 3, 2006.


PAMELA O'LEARY TOWER
Attorney for Defendant TILETILE